[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION CT Page 3139
The plaintiffs in this action seek an order to proceed with arbitration and a stay of the proceedings initiated by the defendant and now pending before the Connecticut Department of Public Utility Control (CDPUC) while the defendant moves to stay the arbitration proceedings. In essence, both parties are requesting that this court determine the appropriate forum in which their underlying dispute should be resolved. To do so, the court must identify and focus upon the true nature of the issue involved.
After hearing, the court finds that the plaintiffs, Connecticut Resource Recovery Authority (CRRA), Southeastern Resource Recovery Authority (SCRRA) and American Ref-Fuel Company of Southeastern Connecticut (Ref-Fuel) agreed to construct, operate and maintain a waste-to-energy facility in Preston, Connecticut (facility). The plaintiffs and the defendant Connecticut Light and Power Company (CLP) entered into an electrical energy purchase agreement (EEPA) which required CLP to purchase from the plaintiffs the entire net electrical energy output of the facility. Plaintiffs' Exhibit 1.
After the facility's construction was completed and it began operation in 1992, CLP discovered that the facility's net electrical output exceeded 13.85 megawatts per hour a number of times for brief periods.
The facility was designed to process 600 tons of waste daily and produce a net electrical output after reduction of the amount of electricity needed to power the facility, or approximately 13.85 megawatts per hour. (emphasis supplied). See Plaintiffs' Exhibit 1. CLP then took the position that it would not pay the higher rates called for in the contract for the excess hourly output, above 14.0[1] megawatts per hour, but instead would pay at a lower rate, its so-called Rate 980 tariff. CLP then imposed a 14.0 megawatt per hour maximum for the output for which it would pay at the contract rate and paid for any hourly excess production at the lower rate. See Plaintiffs' Exhibit 8. The plaintiffs point out that if the output is averaged over CT Page 3140 a longer period of time, say monthly, then there would be no excess output at all, and all of the energy produced would have to be paid for at the contract rate.
The plaintiffs claim in their application to proceed with arbitration that several letters from CLP to them indicate that CLP is disputing the manner in which the facility is being operated and how that operation relates to the EEPA electrical energy purchase requirements. See Plaintiffs' Exhibits 4, 5 and 8. (Letter from CLP's senior counsel Small dated April 6, 1992; letter from CLP's Manager of Cogeneration Administration Ward dated May 15, 1992; and the Ward letter first above-mentioned.) The plaintiffs further claim that these letters are claims by CLP that the plaintiffs have not constructed, operated and maintained the facility in accordance with the terms of the EEPA and have not acted in accordance with the Prudent Engineering and Operating Practices required by the EEPA, and the plaintiffs seek to have these issues arbitrated. CLP argues that at most these letters merely express CLP's position that CLP has some concerns over the manner of the facility's operation, and that at this time, CLP does not have sufficient information to claim that in fact the facility is being operated in violation of the EEPA. CLP further claims that even if the issues identified by the plaintiffs were disputed, arbitrated and decided in plaintiffs' favor, this would not resolve the underlying dispute.
The plaintiffs assert that the EEPA dictates that the parties' claims be determined in arbitration proceedings the defendant asserts that the claims be determined in proceedings before the CDPUC. The court agrees with the defendant.
The relevant portions of paragraphs 28(a) and (b) of the EEPA read:
28. DISPUTE RESOLUTION
 (a) Any disputes regarding payments from Buyer to Seller or interpretations of this Agreement not covered by subsection (b) below, and including but not limited to cost allocations, removal of or securing CT Page 3141 in place of dedicated transmission facilities pursuant to Section 6(c) of this Agreement and disputes regarding insurance pursuant to Section 18 of this Agreement, shall be presented to the CDPUC and the matters submitted to it shall be subject to appeal in the normal manner for appeals from decisions of the CDPUC. If the CDPUC fails or refuses to resolve any such dispute, or fails to act on such dispute within a reasonable period of time not to exceed ninety (90) days, such dispute shall be subject to resolution by any court of competent jurisdiction within the State of Connecticut.
 (b) Any dispute under this Agreement involving Prudent Engineering and Operating Practices, electrical characteristics, construction, operation and maintenance of the Facility, or other engineering or technical issues shall be resolved by binding arbitration in accordance with the requirements of this subsection. . .
One may be compelled to arbitrate a dispute only to the extent and the manner in which one has agreed to do so. John A. Errichetti Assoc. v. Boutin, 183 Conn. 481 (1981). This is to be determined from the express terms of the written contract between them. A. Dubreuil Sons, Inc. v. Lisbon, 215 Conn. 604, 608-610 (1990). The courts favor parties settling differences by arbitration, or by any other method of non-judicial resolution. And where there is an agreement to arbitrate, the court is empowered to direct compliance with its provisions. Gores v. Rosenthal,150 Conn. 554, 557 (1963).
However, under paragraph 28(b) of the EEPA, there must be demonstrated as a condition precedent to arbitration, a bona fide dispute. The plaintiffs point to nothing in any CT Page 3142 of the letters from CLP to them that CLP claims a position contrary to that of the plaintiffs on any of the three issues that the plaintiffs seek to arbitrate. CLP, in its letters, pleadings, in oral argument and in its brief, merely takes no position on these issues, and claims it has insufficient information to stake out such a position.
The court concludes that CLP has correctly identified the point on which the parties are at issue, and that is, what is the rate that CLP is required to pay for excess electrical output, if any.
Paragraph 28(a) of the EEPA provides that "Any disputes regarding payments . . . or interpretations of this agreement not covered by [28(b)] . . . shall be presented to the CDPUC. . . ." The rate which must be paid for the excess output and whether it should be determined or averaged on an hourly, daily, weekly, monthly or otherwise, does not fall within paragraph 28(b). It is difficult to see, even if the plaintiffs prevail in arbitration, how the resolution of the issues as framed by the plaintiffs could lead to the determination of the rate to be paid for the "excess output" or indeed, whether there is any excess output at all. Moreover, rate regulation and determination is peculiarly within the province and expertise of the CDPUC. In Greenwich v. DPUC, 219 Conn. 121, 126 (1991), the court stated, "DPUC's enabling statute thus evinces a legislative intent to rely on the CDPUC to regulate and supervise public utilities and to establish rates that are not unreasonable."
Paragraph 28(a) of the EEPA reflects the intent of the parties to submit disputes about payment or an interpretation of the agreement as to what rate CLP should pay for excess output, or indeed whether, under the agreement, there is any excess output whatever, to the CDPUC.
Moreover, if the CDPUC determines that a resolution of any of the issues as framed by the plaintiffs is necessary before it can resolve the question presented here, it can, as the defendant points out, determine this threshold question.
Accordingly, the defendant's motion to stay arbitration proceedings is granted and the plaintiffs' motion to stay the proceedings before the CDPUC is denied. CT Page 3143
Teller, J.